Criminal Case Template







COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



GARRON P. DAVIS,

                            Appellant,

v.

THE STATE OF TEXAS,

                            Appellee.

§

§

§

§

§

No. 08-02-00421-CR

Appeal from the

282nd District Court

of Dallas County, Texas

(TC# F-0157118-MS)




MEMORANDUM OPINION

           This is an appeal from a conviction for the offense of murder. The jury assessed
punishment at life imprisonment in the Institutional Division of the Texas Department of
Criminal Justice and a fine of $10,000. We affirm the judgment of the trial court.
I. SUMMARY OF THE EVIDENCE
On September 22, 2001, the body of twenty year-old Zacchaeus Fisher was found on
3414 Alaska Avenue in Dallas, Texas. Fisher died of ten gunshot wounds at close range, any
one of which could have been fatal.
Desiree Holmes, Zacchaeus Fisher’s mother, testified that the last time she spoke to
Fisher was the evening of September 22, 2001. Michelle Jackson, Fisher’s aunt, also
testified that she had spoken to Fisher on his cellular phone at around 11 p.m. as he was
taking a car back to an individual named Craig. During their conversation, they made plans
to attend a pool party, when “his phone went dead.” Jackson attempted unsuccessfully to
contact Fisher on his cell phone three or four times.
           Jewel Sneed, Appellant’s front-door neighbor, testified that she and her son Charles
Marshall returned home on the evening of September 22, 2001 shortly after it became dark. 
A large street light was located at the end of the driveway. Sneed’s son Charles backed up
his vehicle in the driveway of her home, parking the vehicle facing outward towards
Appellant’s residence with its headlights shining on the house. Sneed then testified she saw
Appellant come out of his house and go to the car in the driveway and get a gun. She heard
two or three gunshots while attempting to enter her home; however, she never saw Appellant
or Fisher shoot. Sneed then saw a second person at the scene but she did not know whether
that person was a man or a woman. She testified she never saw anyone else other than
Appellant with a weapon.
           Talitha Kurkpatrick testified that she was Appellant’s girlfriend and that she was at
the Appellant’s residence when Fisher was killed. She testified that she was at Appellant’s
residence where they were watching television at approximately 11 p.m. Kurkpatrick said
Appellant had been smoking crack cocaine that night and described his behavior as “weird.” 
She testified that Marshall backed his vehicle into the driveway across the street to where the
headlight shined on the Appellant’s residence. She observed Marshall and his mother get out
of the car and walk toward their house. She testified that she saw an El Camino drive up and
park next to the Appellant’s house, and she noticed Fisher step out of the vehicle and walk
into the yard adjacent to the Appellant’s residence. The two properties are separated by a
thin metal linked fence and Fisher was standing at the fence between the two properties. At
that moment, Kurkpatrick heard Appellant ask Fisher if he knew somebody, she did not hear
Fisher respond, she next saw Fisher “fall and die.” Talitha testified that Fisher did not have
a weapon, and the only thing in Fisher’s hands was a cell phone. She did not observe Fisher
make any movements toward the Appellant, and the only movement Fisher made was to
press a button on his cell phone when it rang. After the first shots, she noticed Appellant
jump the fence that separated the two properties and continue to shoot Fisher at close range. 
At this point she did not see Fisher struggle or attempt to get back up. Appellant told her that
he shot Fisher ten times. After the shooting, Talitha and Appellant left in the car that was
backed into the driveway and did not return until the following morning.
           Dallas Police Officer Glen Thompson testified that he was dispatched to 3414 Alaska
Avenue in response to a shooting call at about 11 p.m. Upon arriving at the scene, Officer
Thompson noticed the body of Zacchaeus Fisher on the ground positioned face-up with his
hands on his stomach and a cell phone near the body. Officer Thompson noticed black gun
powder on Fisher’s torso, head, and clothing and concluded, based on his experience, that
Fisher had been shot at close range. Thompson then assisted the medical examiner in
securing the crime scene.
           Charles Marshall testified that he and his mother arrived at his mother’s residence on
Alaska Avenue sometime between 10:30 and 11:30 p.m. after attending a funeral. He backed
his car onto the driveway to where his front lights shined onto Appellant’s residence. 
Marshall testified that they remained in the vehicle for a few minutes when he observed a
person and a dog through Appellant’s window. Several minutes later he observed Appellant
come out of his house with a pistol and walk to an abandoned vehicle that was in an open
field. Once at the vehicle Appellant checked the doors and trunk of the abandoned car. 
Marshall stated Appellant then returned to the car that was backed into the driveway and
flashed his lights onto Marshall’s face and then went around the vehicle and opened the
trunk. A second person whom Marshall could not identify came out of the house and joined
Appellant at the vehicle in the driveway. Marshall testified that he did not see the second
person with a weapon. Marshall noticed an El Camino drive and park in front of the property
adjacent to Appellant’s house and observed one person get out of the vehicle and walk up
the ramp of Georgia Jones’ property. Jones was Appellant’s next door neighbor. At that
point, Marshall testified that he overheard Appellant call out from the trunk of the vehicle
backed into the driveway to Fisher inquiring who he was. However, Marshall did not hear
Fisher’s response. Marshall then saw a flash from the muzzle of Appellant’s pistol towards
Fisher’s chest at close range and saw Fisher fall to the ground. Marshall testified to hearing 
about nine to ten shots after a brief pause between the first several shots. The witness related
that he did not witness Appellant jump the fence. During the shooting Marshall waited
behind a brick wall that was at the side of his mother’s house. After the shooting, Appellant
and a second person drove away in the vehicle that was backed into the driveway.
           Marshall then called 911 to report the shooting. During the trial, the 911 tape was
admitted into evidence and played for the jury. During Marshall’s 911 call, he did not
disclose Appellant as the shooter.
           Dallas Police Department homicide detective, Brent Maudlin, testified he responded
to a crime scene at 3414 Alaska Avenue on September 22, 2001. Maudlin had been informed
by other crime scene officers that Charles Marshall was a potential witness to the shooting.
Maudlin met with Marshall at a remote location, a nearby gas station, because of safety
concerns Marshall had regarding the shooting. During that initial interview, Marshall named
Appellant as the shooter and provided Maudlin with the information on how to contact him. 
The next day when Appellant returned to his residence, he was arrested. Appellant’s clothing
was confiscated for evidence analysis. A week later, Maudlin met with Marshall and
obtained a written affidavit detailing the events of the shooting. He also showed Marshall
and Sneed a photographic line-up and they identified Appellant by circling and dating
beneath his picture.
           Kathy Kresse, a Dallas Police Department detective testified about the evidence she
collected when she responded to the shooting on 3414 Alaska Avenue. At the scene she
found five .9 mm shell casings near the body and along the fence. She also found a cell
phone in the victim’s hand. As part of her investigation, Detective Kresse photographed the
scene, the body, and the location of the shell casings. Kresse testified she was not able to lift
any latent fingerprints from any of the shell casings. Raymond Cooper, an expert firearm and
tool mark examiner, analyzed the casings which were retrieved from the crime scene and
from the autopsy. Cooper concluded that all five shell casings had been fired from a single
weapon. He was able to determine that one of the fragments came from a single weapon, a
.9 mm weapon, and all the fragments came from that single weapon.
           Vickie Hall, a trace evidence analyst, testified that she analyzed Fisher’s hand
wipings. The hand wiping results were found to be inconclusive because only two of three
elements that prove the presence of gunshot residue were found. Antimony, lead, and barium
must be found to conclude that gunshot residue was present on the victim, and to suggest that
the victim either fired a gun or was close to a gun when it was fired. Hall’s findings did not
exclude the theory that Fisher fired a gun; however, her findings also supported the theory
that Fisher had his hands in the way or around the gun when it was fired at him. Hall
examined Fisher’s T-shirt worn at the time of the shooting. She testified that Fisher’s shirt
contained gunpowder at very high levels which suggested that he was shot at close range.
           A forensic scientist, Katherine Long, testified regarding the DNA analysis conducted
on the clothing seized from Appellant at the time of his arrest. She explained how she
received autopsy blood samples from the victim, as well as the victim’s clothing and
Appellant’s clothing. She testified that Appellant’s clothing contained blood stains and
other small blood particles. The victim was excluded as the donor of the blood found on
some parts of the back of Appellant’s jeans and shirt. Long stated that the blood samples that
were collected were a mixture of several DNA materials that did not allow her to conduct an
accurate statistical analysis of the DNA. As a result, Long was unable to conclude that the
deceased had contributed to the blood found on Appellant’s clothing.
           Dallas Police Officer Willie Parham testified that on Sunday, September 23, 2001, he
was dispatched to the residence on Alaska Avenue after a neighbor reported that Appellant
had returned to his residence. Parham observed a vehicle near the residence with the trunk
and doors open. He also noticed Appellant inside the residence looking through bay
windows. Parham testified that he called out to Appellant to come out of the house,
Appellant then yelled out an obscenity and pointed at the officer. According to Officer
Parham, Appellant released a pit bull from the house. Parham shot the dog after it attacked
his partner and attempted to attack him. Consequently, Parham dispatched a tactical unit to
the residence and evacuated other individuals for safety concerns. Officer Parham testified
that after about forty-five minutes, Appellant came out of the residence and sprung through
the backyard in an attempt to evade police until he was detained and taken into custody.
       Sheila Spotswood, the medical examiner, testified regarding the autopsy that was
performed by one of her colleagues. Spotswood explained the findings of the toxicology
report which found a presence of .01 percent alcohol in the body of the deceased along with
a small amount of marijuana by-product. The autopsy report established that there were a
total of ten gunshot wounds to the body of the deceased. The examiner explained that some
of the gunshot wounds showed the presence of both stippling and soot. Spotswood testified
that stippling is caused when particles of gunpowder strike the skin. She also explained how
the presence of soot, which is a smoky discharge or material from a firearm, can indicate a
close range of discharge. The data from the autopsy report indicated that any of the gunshot
wounds were potentially fatal. The cause of death was “multiple gunshot wounds.”
           Appellant testified in his own defense. He testified that on the night of the shooting,
he noticed a BMW back up into Ms. Sneed’s property. Since that car was unfamiliar to him,
Appellant became concerned and went outside to the car in his driveway. Once inside the
car, Appellant shined the headlight onto the BMW until he was able to recognize Jewel
Sneed. Appellant testified that he had been doing chores all day. He decided to go out to a
club with his girlfriend, but he first wanted to wash his car. While Appellant was looking
for cleaning supplies in the opened trunk of his Lincoln Town Car, he noticed an El Camino
parked in front of the next door residence. Appellant was familiar with that particular vehicle
because it belonged to his neighbor Craig, a drug dealer who was also known as “Fat
Daddy.” Appellant decided to approach the driver of the El Camino because he wanted to
buy a bag of marijuana from Fat Daddy, but when the driver approached the gate, Appellant
realized that the driver was not Fat Daddy. Appellant explained that since it was dark he did
not realize that the driver was not Fat Daddy; however, he was able to notice that the driver
had a cellular telephone. The driver, Fisher, got out of the vehicle and walked to the opposite
side of the fence where Appellant was standing. Appellant testified that he called out to
Fisher, “I thought you were Fat Daddy.” Fisher then pulled a gun on Appellant saying, “You
know what it is.” Then he ordered Appellant to come across the fence. Appellant complied
with Fisher’s commands as he was in fear of his life. Once on the other side of the fence,
Fisher pressed the pistol against Appellant’s side and attempted to pat him down to search
for money. Appellant testified that a car approached them and Fisher looked up
momentarily. Since Fisher was distracted, Appellant took the opportunity to knock the pistol
out of his hands and then kick him at the same time. Appellant then grabbed for the gun and
it discharged one time. Appellant testified he fired a shot at Fisher because he continued to
be afraid of being killed. After the first shot was fired, Appellant stated that Fisher moved
backwards slightly, but continued standing. Appellant then testified to firing two more shots
because he continued to be in fear of his life. He could not explain why the medical
examiner found Fisher had been shot ten times. Appellant also denied that he had been
smoking crack on September 22, 2001--the night of the shooting. After shooting Fisher,
Appellant stated that he threw the gun to the ground and fled the scene with his girlfriend in
the Lincoln Town Car.
          Appellant testified that he fled from the residence and passed by later that night and
noticed it was a surrounded by police. He did not stop because he was afraid of going to jail. 
The following morning when the police arrived at Appellant’s house, he was uncooperative
and fled on foot through the backyard of his residence. He testified that he fled because he
wanted to be arrested in the presence of other witnesses. Appellant denied that he refused
to come out of his house the day after the murder or that he used profanity toward the police. 
A police videotape was submitted to the court which depicts the Appellant as uncooperative. 
According to Appellant, when policed arrived the next day at his house, he came out
willingly with his hands raised. He admitted that he did not claim he was the victim of an
aggravated robbery when he was first questioned by police.
           In rebuttal of Appellant’s case, Dallas Police Department Detective Kenneth Penrod
testified regarding Appellant’s prior voluntary statement. Detective Penrod testified that
after the Appellant’s arrest, he advised him of his Miranda rights and had him sign and date
a statement that he understood those rights. Penrod then questioned Appellant concerning
the shooting. Detective Penrod recalled that Appellant initially denied any involvement in
the shooting; however, once he was confronted with the fact that his girlfriend had said he
was the shooter, Appellant finally admitted that he had shot Fisher. Penrod wrote out a
statement that Appellant dictated to him. Appellant refused to have his admission that he
shot Fisher included in the written statement. Penrod testified that neither verbally nor in the
written statement did Appellant ever indicate to him that Fisher had a gun. During
questioning with Detective Penrod, Appellant never stated that he struggled with Fisher or
that he feared for his life at any point.

II. DISCUSSION
           In Issue No. One, Appellant contends that the evidence is legally insufficient because
a rational trier of fact could not have found beyond a reasonable doubt against the Appellant
on the self-defense issue. In reviewing the legal sufficiency of the evidence, we are
constrained to view the evidence in the light most favorable to the judgment to determine
whether any rational trier of fact could find the essential elements of the offense, as alleged
in the application paragraph of the charge to the jury, beyond a reasonable doubt. Jackson
v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Butler v. State, 769 S.W.2d
234, 239 (Tex. Crim. App. 1989); Humason v. State, 728 S.W.2d 363, 366 (Tex. Crim. App.
1987). More particularly, sufficiency of the evidence should be measured by the elements
of the offense as defined by the hypothetically correct jury charge for the case. Malik v.
State, 953 S.W.2d 234, 239-40 (Tex. Crim. App. 1997).
           Our role is not to ascertain whether the evidence establishes guilt beyond a reasonable
doubt. Stoker v. State, 788 S.W.2d 1, 6 (Tex. Crim. App. 1989), cert. denied, 498 U.S. 951,
111 S.Ct. 371, 112 L.Ed.2d 333 (1990); Dwyer v. State, 836 S.W.2d 700, 702 (Tex. App.--El
Paso 1992, pet. ref’d). We do not resolve any conflict in fact, weigh any evidence or
evaluate the credibility of any witnesses, and thus, the fact-finding results of a criminal jury
trial are given great deference. Menchaca v. State, 901 S.W.2d 640, 650-52 (Tex. App.--El
Paso 1995, pet. ref’d); Adelman v. State, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992);
Matson v. State, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991); Leyva v. State, 840 S.W.2d
757, 759 (Tex. App.--El Paso 1992, pet. ref’d); Bennett v. State, 831 S.W.2d 20, 22 (Tex.
App.--El Paso 1992, no pet.). Instead, our only duty is to determine if both the explicit and
implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial
in the light most favorable to the verdict. Adelman, 828 S.W.2d at 421-22. In so doing, we
resolve any inconsistencies in the evidence in favor of the verdict. Matson, 819 S.W.2d at
843 (quoting Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)). The trier of
fact, not the appellate court, is free to accept or reject all or any portion of any witness’s
testimony. Belton v. State, 900 S.W.2d 886, 897 (Tex. App.--El Paso 1995, pet. ref’d).
           A person is justified in using force against another when and to the degree he
reasonably believes the force is immediately necessary to protect himself against the other’s
use or attempted use of unlawful force. Tex. Penal Code Ann. § 9.31(a) (Vernon 2003). 
The use of force against an individual is not justified in response to verbal provocation alone. 
Id. § 9.31(b)(1). A person is justified in using deadly force against another: (1) if he would
be justified in using force against the other under section 9.31; (2) if a reasonable person in
the actor’s situation would not have retreated; and (3) when and to the degree he reasonably
believes the deadly force is immediately necessary to protect himself against the other’s use
or attempted use of unlawful deadly force. Id. § 9.32(a)(1)-(3)(A). The Penal Code
justification for self-defense focuses on the existence of some necessity, the circumstances
under which the force was used, the degree of force used, and the type of conduct against
which the force was used. Kelley v. State, 968 S.W.2d 395, 399 (Tex. App.--Tyler 1998, no
pet.). The amount of force used must be in proportion to the force encountered. Id. Deadly
force is not immediately necessary if a reasonable person in the position of the defendant
would use some available non-deadly method of self-defense. Id. In such circumstances, a
defendant’s use of deadly force would not be justified. Id.
           Apparent danger is a facet of self-defense. Brooks v. State, 548 S.W.2d 680, 684
(Tex. Crim. App. 1977). If raised by the evidence, on timely request, a defendant is entitled
to have the jury instructed that he may defend himself from apparent as well as actual danger
as viewed from his standpoint at the time. Id. In the present case, the court’s charge to the
jury included instructions on self-defense and apparent danger.
           In resolving the sufficiency of the evidence issue on a self-defense submission, the
reviewing court looks not to whether the State presented evidence which refuted Appellant’s
self-defense testimony, but rather whether after viewing all the evidence in the light most
favorable to the prosecution, any rational trier of fact would have found the essential
elements of murder beyond a reasonable doubt and also would have found against Appellant
on the self-defense issue beyond a reasonable doubt. Saxton v. State, 804 S.W.2d 910, 914
(Tex. Crim. App. 1991).
           Appellant contends that the evidence indicated that it was difficult to see at that hour
of night the murder occurred. Further, he notes that Jewel Sneed and Charles Marshall were
uncertain about the sex and identity of Appellant’s companion. Appellant also argues that
there was no evidence contradicting Appellant’s contention that he acted in self-defense. As
stated, it was not incumbent upon the State to specifically disprove Appellant’s version of
events. In fact, Marshall testified the area was lighted by a streetlight. Kurkpatrick and
Marshall both testified that Appellant killed Fisher and Kurkpatrick testified that there was
no struggle between the two when Appellant shot the decedent. Marshall related that he saw
Fisher go down with the first shot and he saw Appellant fire upon Fisher numerous other
times. Marshall never saw Fisher make a movement toward Appellant. Aside from
Appellant’s assertions, the testimony, in sum, indicated that no robbery occurred and
Appellant was neither in a defensive posture nor was he in a position where he could not
retreat. Issue No. One is overruled.
           In Issue No. Two, Appellant argues that the evidence is factually insufficient to
support the conviction because the implied finding against the self-defense issue was so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust and
secondly, because the evidence was too weak to support such finding. When conducting a
review of the factual sufficiency of the evidence, we consider all of the evidence, but we do
not view it in the light most favorable to the verdict. Clewis v. State, 922 S.W.2d 126, 129
(Tex. Crim. App. 1996); Levario v. State, 964 S.W.2d. 290, 295 (Tex. App.--El Paso 1997,
no pet.). We review the evidence weighed by the jury that tends to prove the existence of the
elemental fact in dispute and compare it with the evidence that tends to disprove that fact.
Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); Jones v. State, 944 S.W.2d 642,
647 (Tex. Crim. App. 1996), cert. denied, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54
(1997). A defendant challenging the factual sufficiency of the evidence may allege that the
evidence is so weak as to be clearly wrong and manifestly unjust, or in a case where the
defendant has offered contrary evidence, he may argue that the finding of guilt is against the
great weight and preponderance of the evidence. See Johnson, 23 S.W.3d at 11. Although
we are authorized to set aside the fact finder’s determination under either of these two
circumstances, our review must employ appropriate deference and should not intrude upon
the fact finder’s role as the sole judge of the weight and credibility given to any evidence
presented at trial. See id. at 7. We are not free to reweigh the evidence and set aside a
verdict merely because we feel that a different result is more reasonable. Cain v. State, 958
S.W.2d 404, 407 (Tex. Crim. App. 1997); Clewis, 922 S.W.2d at 135.
           Similarly, a factual sufficiency challenge to a verdict implicitly rejecting a defense
requires us to review all of the evidence in a neutral light and ask whether the State’s
evidence, if taken alone, is too weak to support the finding and whether the proof of guilt,
although adequate if taken alone, is against the great weight and preponderance of the
evidence. Zuliani v. State, 97 S.W.3d 589, 594-95 (Tex. Crim. App. 2003). The issue of
self-defense, based upon the testimony of Appellant that conflicts with that of the other
witnesses, was a fact issue for the jury. See Saxton, 804 S.W.2d at 913-14; Manuel v. State,
981 S.W.2d 65, 68 (Tex. App.--Fort Worth 1998), aff’d, 994 S.W.2d 658 (Tex. Crim. App.
1999). The jury was solely responsible for determining the credibility of the witnesses and
was free to accept or reject the defensive evidence. Saxton, 804 S.W.2d at 914.
           Appellant contends that the evidence is factually insufficient for much the same
reasons as enumerated in his issue concerning the legal sufficiency of the evidence. 
Appellant contends that Appellant had the right to defend himself and the jury’s implicit
finding that he was not acting in self-defense was clearly wrong and unjust because the jury’s
finding clearly shocks the conscious and the State’s evidence taken alone is too weak to
support the jury’s finding.
           However, there was evidence that Fisher never had a weapon and that a struggle never
occurred thereby making Appellant’s contention that a robbery was in progress implausible. 
We find that the evidence is factually sufficient to support the conviction. Issue No. Two is
overruled.
           In Issue No. Three, Appellant contends that the trial court erred in admitting into
evidence certain autopsy photographs. During the testimony of the medical examiner, the
State offered into evidence State’s Exhibit Nos. 50 through 77. Each was an autopsy
photograph. Appellant objected to the admission of the exhibits under the provisions of
Texas Rules of Evidence 401 and 403.


 The State countered that the photographs were
admissible to demonstrate the nature of the entrance and exit wounds and the stippling effect
of the gunshot wounds. After finding that the photographs were relevant and after
conducting a balancing test, the court excluded State’s Exhibit Nos. 52, 57, 58, 59, 64, 65,
67, 69, and 70 and admitted the others into evidence. On appeal, Appellant contends that the
photographs admitted into evidence were needlessly gruesome and the probative value of the
photographs were substantially outweighed by the danger of unfair prejudice thereby causing
the jury to convict upon emotion. The State contends that the trial court did not abuse its
discretion by admitting State’s Exhibit Nos. 50-51, 53-56, 60-63, 66, 68, and 71-77 because
their gruesome nature was inherent in the depiction of so many bullet wounds.
            The admissibility of a photograph is within the sound discretion of the trial court and
the trial court’s decision will not be disturbed on appeal unless it falls outside the zone of
reasonable disagreement Hayes v. State, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002). Rule
403 provides that relevant evidence “may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice . . . .” Tex. R. Evid. 403. In determining
whether the probative value of photographs is substantially outweighed by the danger of
unfair prejudice, the court may consider many factors, including: the number of exhibits
offered, their gruesomeness, their detail, their size, whether they are black and white or color,
and whether they are close-up. See Salazar v. State, 38 S.W.3d 141, 152 (Tex. Crim. App.
2001). Autopsy photographs are generally admissible as long as the disturbing nature of the
photos is primarily due to injuries caused by the Appellant rather than the autopsy itself. See
Hayes, 85 S.W.3d at 815-16. 
           Autopsy or post-autopsy photographs can be used to illustrate injuries and to reveal
cause of death. “[W]here pictorial evidence will help the jury to understand verbal
testimony, such as the technical language used by a medical doctor in describing the injuries
sustained by a victim of a crime, a trial judge does not abuse his discretion in admitting these
photographs.” Harris v. State, 661 S.W.2d 106, 107 (Tex. Crim. App. 1983). When the
power of the visible evidence emanates from nothing more than what the defendant has
himself done, we cannot hold that the trial court has abused its discretion merely because it
admitted the evidence. A trial court does not err merely because it admits into evidence
photographs which are gruesome. Paredes v. State, 129 S.W.3d 530, 540 (Tex. Crim. App.
2004).
           In the present case, we are not persuaded that the danger of unfair prejudice
substantially outweighed the probative value of the questioned photographs. The
photographs show the various exit and entry wounds of the ten wounds and the stippling
effect the gunshots had upon the victim’s body. This corroborates the testimony of the
medical examiner and the photographs, albeit they are gruesome, show no more than the
effect of the wounds upon the victim’s body. Therefore, we hold that the trial court
committed no error in admitting the exhibits. Issue No. Three is overruled.
 

           Having overruled each of Appellant’s issues on review, we affirm the judgment of the
trial court.
 
                                                                              RICHARD BARAJAS, Chief Justice
August 31, 2004

Before Panel No. 3
Barajas, C.J., Larsen, and Chew, JJ.

(Do Not Publish)